Your Honor, my name is Robert Dowd. I'm from Dallas, Texas. Please excuse my voice. I'm losing it in my settings. I go from spasmodic dysphonia, or Diane Ream's type, to opinions that I've had too many times playing football at Harvard. But in either case, I hope you can understand me. And if not, if I can repeat anything that may need to be said from there. You could have played for a better school. I did play in the 29-29 tie with Tony Jones, so I didn't do too badly, Your Honor. But anyway, getting to this case... I do appreciate, Mr. Dowd, that that was not a unanimous opinion. With regards to this case... I'll stay neutral. I appreciate the opportunity, because we never really got to arguing this case before the jury, the way it should have been argued with it. We enlisted a handful of people who started American Capital Energy. And when they started the company, with respect to it, they were down to the matter of the world's largest solar relay on the Atlantic City Convention Center. When they came, they built it by taking all of them, teaching all of these electricians and contractors and engineers and everyone to build it. When they came back here, they then looked to expand the company. That's the time when Mr. Ellicott entered the company. At that time, when he entered, he was given a policy as to what his income would be with the company. And at that time, all of the outside costs for all of these engineers, for all of these different parties in construction, electrical, everything was charged off onto the contract, leaving a small amount going to the company, which he was more than willing to pay 40%. At the end of that operation, with respect to it, the company then hired all of these people, brought in over 30 employees, engineers, electrical contractors, accountants, and in particular a sales staff that was headed up by Gail Ritham. And at that time, they set forth a new policy that was out to the employees that looked. Now we have all these people doing the same thing. Mr. Dowd, what you referred to as a policy, the first thing you referred to was a compensation agreement. It wasn't an agreement in my mind. The district court found that it was an agreement. You have argued in your brief that it was not an agreement. You've argued that you had a right to vary it, which the district court found you could only do with Mr. Ellicott's consent. At the point, Your Honor, it was what our argument has always been. In fact, if you look at it, it was in fact a policy sent out. It in fact never listed anything about it. Signed by Mr. Ellicott. And during the course, that's the whole key to this case. I've read the document under which Mr. Ellicott was hired. It looks to me like a contract. And I think a reasonable person would have considered it to be a contract. And indeed, the company apparently thought it was a contract, because on its tax returns and its financials, it accrued those payments that Mr. Ellicott never received, but the company deducted and accrued for tax purposes. Yeah, because it was an accrual tax payment. Yes, but it accrued them in the amounts shown on the contract with Ellicott. If in fact that is the case, Your Honor, every single contract with IBM salespeople and everyone else in it, every six months, IBM and every company, when things change considerably, how do you expect a company to pay 30 different people to do a job that is deductible in the policy given to them? That's it. Excuse me. For all of the wording of the compensation agreement, what I expect as a judge is that a company will follow the terms of its compensation agreement with a particular employee, if it has such an agreement. The company could have worded this agreement differently, but it stuck with the wording that it put on the page. Ellicott didn't draft this agreement. The compensation agreement was drafted and sent to him. He knew he accepted the agreement. I don't want to disagree with you. Counsel, could you turn to the legal issues that we're facing here and what your disagreement with the economic is? Talk about the Wage Act and why you think it does not apply. With respect to the Wage Act, the Wage Act keywords are at the time of sale. Each of the contracts that are involved in this case involve, based on a preliminary design, subject to a final design, and set forth a per-bought basis for the contract. It is totally unknown at that time how large this is going to be, what is going to be permitted, what are the expenses that are going to be occurring in trying to build it, and more importantly, is there going to be a profit with respect to the operation? When you deal with all those issues, the company spent $11 million on housing, and housing lost money. Mr. Ellicott steps up and says, I want to tell you when you think there was no profit. But the point is, at the time of the contract, it is totally unknown as to what, in fact, is going to be the contract itself, which was the specific exception of the Wage Act with respect to this, that the Wage Act was, in fact, to be something specific, dealing with wages paid bi-weekly, monthly, etc. But it is basically, from a lot of decisions that have come down, has been rather masternized with respect to it. The point is, it is important that this court come down with a specific decision. At the time of sale, you have specific amount, whether it is services, whether it is obligations, or whatever. This is a state law issue. We have to give our best assessment of what Massachusetts law is. What is your best Massachusetts case on this point? Two cases. One from Judge Sarkin, called the Robo-Rialto case. In which it sets forth, specifically, that when contracts are based on a profit, that at the time of sale, unless you know specifically what you have with respect to it, it is, in fact, a profit case, and therefore it is not within the Wage Act. And that is the biggest key here, is everything was unknown as to whether it even could be built. There is a construction case. There is another case amongst us, which I cite and attach, which also deals with that same issue with respect to it. Excuse me, that second case is what? It's S-U-O-M-E-N-I-E-N. And that's a decision of the Massachusetts Supreme Judicial Court? I can't remember what side it, I haven't. I put a copy of it in the back of my brief from there, which, again, deals with this issue. At the time of sale, what do you know? Because if you don't have that, then under Mass. Law, there are no exceptions to the Wage Act, whatsoever, when it was specifically set forth to turn around and avoid those type of situations. The other point that I wanted to make with respect to it is the equitableness problem, issues with regards to this case. We had set forth specific questions to be raised. Judge Saylor stepped up and said, I'm not going to go through all these questions. We're going to ask two questions dealing with its equitableness problem. Because eight of the projects here were outside the statute of limitations. I agreed to that. I didn't have any problem with it. Because we had stipulated that all of the eight of the nine projects was outside the statute of limitations. And the issue then would be, are they willing to apply equitableness problem and do something with it or not? We also established at trial that in fact, five months before the very first contract here was to be made, that they told the dispute that Warner had jammed in between the company and Mr. Ellicott. So that meant he had five months to file suit. Judge Saylor had that kind of opinion on that, I think on July 22nd of 2016, where he said specifically, if you have time to file a lawsuit after you've hit Warner in with somebody, you don't get to argue equitableness problem. You don't get to argue with respect to the issues that they have. So I was very content. The jury came back, and they filed zero of the two equitableness problem questions, specifically set forth by Judge Saylor. Judge Saylor sent them back out to reconsider their opinion. They came back, and they said the same thing, zero of the two equitableness problem questions. And then that's when we have a problem. Judge Saylor then changed what he told the jury. He told them at that point, well, you can't say that they're lying under the Wage Act without coming up with some kind of number. So the jury goes out a third time. Did he do that at your request? Yes, that's in my opinion. I'm sorry? Didn't he do that at your request? No, my request was that it was a little strong, and they came back a second time with the zeros from there. And that is, sending it back out that way resulted in them practically telling him he had to come up with a number with regards to it, which is totally opposite to why we put the questions in. I'm not quite clear on what the argument is. Is the argument that Judge Saylor was wrong in saying the Wage Act requires that there have been some damages before there is a violation? Yes, Your Honor, because what he did was to leave those questions for us and to stop them instead of being able to show. We had paid this gentleman $613,000. The jury did very well. As he had stated in the argument that was put in the brief, he said that if they could find zero, they could find $100,000. And the point was, he said that's why the two questions went to the jury.  but not live because the statute is running and he hasn't even paid $613,000. I'm sorry, I may have misunderstood, but did you just say at some point the judge instructed the jury that they could find a zero verdict and find a Wage Act violation? No, Your Honor, that's exactly what he told us when, in fact, he was put the questions in. In fact, the court, and it's in our appendix, he said specifically to us, I've got to put these questions in because I have to know whether or not they're going to find even one of them liable with respect to this issue. So there was no objection to it. That's why it went in in the first place. But the last point I'd like to make is, Your Honor, we issued a policy statement with regards to in writing to the employees. We issued a policy statement to employees which was done on February 12th of 2012 about the employees got a choice. He could either quit or he could stay with the company. And at that point, we ended up with a project here in High California to which Mr. Ellicott was looking for $534,000 which he borrowed to the jury. We were totally excluded from preventing that evidence. We were totally precluded from setting forth the testimony and bail with them to join the company to get a 10% commission. If you look at the numbers... There was a series of rulings on that that amounted to too little, too late. As to the one witness you had listed, her affidavit was inconsistent with the 30B6 deposition of the company. The other witnesses had not, in fact, been listed. This was... by the trial judge as a last-minute switch of theory as to which the plaintiff had not had adequate notice and it would be unfair to allow you to do this. That's... The standard of review for those sorts of decisions, assuming an objection is preserved, is abuse of discretion. So why was that an abuse of discretion? Because your own policy statement was submitted at depositions and was listed as an exhibit and was discussed in the depositions. Gail Brim's testimony split commission was discussed in the depositions. The pre-trial memorandum that was set forth to the judge six months before trial specifically set forth the calculations with respect to it. They specifically set forth everything that was put forth for the trial. What happened in this case was there would have been plenty of depositions because Mr. Kennedy went to the first attorneys in the case. Remember, the first group of attorneys went over all this. They left. They stepped in. The judge refused to give them any discovery. They could only give a 30-B-6. We gave them a list of witnesses. They only called three of them. So it didn't all of a sudden say a 30-B-6. We had a list of everyone to come testify. They didn't call them all. But the bottom line was all of this has been done. It was all laid out. It was laid out as an exhibit. Okay. Thank you. Thank you, Your Honor. Mr. Kennedy. Good morning, Your Honor. May it please the court, Christopher Kennedy for the plaintiff appellee, Stephen Ellicott. As outlined in the appellee's brief, the district court's judgment in favor of Mr. Ellicott should be affirmed for several simple reasons. First, this is a clear-cut case involving a violation of the Massachusetts Wage Act. The contract at issue, as Judge Selya recited, involves some simple language. It was drafted by Ace, the defendants. And it says, quote, sales commission, unquote. That's capitalized. It then says 40% of profit margin on each sale to be paid within 30 days of sale and installation. Could not be more clear. Chapter 149, Section 148, the Wage Act itself requires that these be definitely determinable and due and payable. Both of those are met here. A stipulated exhibit, Trial Exhibit Number 3... His argument was, excuse me, I'll defer to Judge Selya. Your definite, thank you, Judge Lynch, your definition, your argument is that the definition of due and payable under the Wage Act means that they have to be definitely determinable and due and payable at some point, not necessarily at the point the contract is entered into. That's correct, Your Honor. In fact, I dispute my brother's contention that the Wage Act requires that it be at the time of sale because, of course, not all wages involve sales. Some are service contracts. So, yes, Your Honor, what is necessary is that at the time, in this context, that the sale or project is completed, that the profit margin, the commission itself, be definitely determinable and due and payable. That is undisputed. I say that because it was the subject of a stipulation in trial. It was Trial Exhibit No. 3. It was a chart that's in the record, and the parties stipulated to the date of each contract that Mr. Ellicott sold, the completion date for each of those contracts, the amount of revenue they generated, and the costs. By simple math, you could subtract the costs from the revenue and have the profit margin. And that's how we calculated the commission that Mr. Ellicott was due. Judge Boroughs, in the District Court, in the Israel v. Voya case, made a clear distinction between what's a bonus and what's a commission. Here, it's clear that Mr. Ellicott's compensation was a commission. It was the only compensation he earned. This was not like a bonus he obtained on top of a salary. He had no salary. Unlike the other ace personnel that the defendants wanted to share Mr. Ellicott's commissions with, he had no salary. They all did. Mr. Ellicott had to close these deals, and they had to be profitable, or he didn't get paid. Did he get any advances against the anticipated commissions? Yes, Judge Lynch, he had a draw against his commission. For how long? Throughout the period? He started employment in 2007. The draw continued in 2011, and they stopped it. He continued to pay, I'm sorry, he continued to work with no draw and no commission for another year, because at that point he was entirely at risk. He'd worked for five years. He closed $1.3 million of commission work for a total revenue of $37 million per ace, and they hadn't paid his commissions. So he didn't quit immediately. And as I understand the equitable estoppel issue, you relied on statements made to your client that he needed to be patient. And there were cash flow issues, but they guaranteed that he would be paid his commissions. Precisely, Your Honor. That's important. This was an equitable tolling argument. I was just going to say equitable tolling, not equitable estoppel. Yes. Yes, sorry. And that's important because as the defendant appellants concede on page 22 of their brief, this trial was conducted by consent on the issue of equitable tolling. That's a quote from the brief. In other words, they did not object to Judge Saylor's instructions on equitable tolling or the jury questions on that equitable tolling. It was not the subject of a Rule 50A or 50B motion for directed verdict. It's been entirely waived for the purpose of appeal. Moreover, the conversion of an equitable tolling argument to an equitable estoppel argument didn't arise until we were before this appeals court. It was never raised before the district court that equitable estoppel should be governing this case. There was never a request for instruction on that. And under the Boston Beer Company case, that's been waived as well. So the statute of limitations issue, we say, really is out of the case. It was tried by consent of the defendants. The judge instructed on the issue. The jury found on the elements and they award the damages for it. What about the preclusion of evidence issue? Judge Saylor, that's a bit of an enigma to me. The simple contract that Ace drafted says that commissions may be split by mutual agreement. The parties in that contract were Ace and Ellicott. So mutual agreement would mean both of them have to agree or there's no split for his commission. The defendants were adamant throughout summary judgment briefing that Ellicott never agreed in writing or orally to split his commissions. They called him selfish. He said, that's how I support my family. But the important thing is they said he never agreed. So when Judge Saylor looked at this simple contract and the condition that commissions may be split only by mutual agreement and the defendants were conceding he never agreed, then they couldn't introduce any extrinsic evidence as to him being required to split anything. It was rather simple and elementary. Where it gets complicated, Your Honor, is later in the case, literally the 11th hour after three years of litigation, we're ready for trial and the defendants want to submit Gail Whitham's unsigned affidavit and these other fellows who weren't on the witness list to deal with. And want them to say, you know what, Ellicott actually agreed. We want to put evidence that he agreed to split his commissions. Which was diametrically opposed to their position at their 30 v. 6 deposition. That Ellicott was the greedy guy who wouldn't agree to share anything. Now they want to put evidence in, well in fact, he did agree to it. Judge Saylor correctly saw through that and said no. Not at the 11th hour, not in direct contradiction of your own 30 v. 6 testimony. And that was proper. Frankly, a ruling to the contrary would have arguably been an abuse of discretion. So we don't see that as any issue for appeal either. Alright, so your position as I understand it is that the defendants, because of their own litigation position, are traditionally going to start from attempting at the 11th hour, as you put it, to raise this he actually consented defense. They're not relying solely on the rationale that these names weren't on the witness list or the so-called with an affidavit wasn't proffered in a timely fashion. It's the collective sum of those problems, your Honor. Really, they're all problematic to us, independently and collectively basis for keeping the evidence out. That takes me to the issue of the jury verdict slips. The first jury verdict slip came back and the jury found that all three defendants had violated the Wage Act. The jury awarded damages of $958,830. They placed the full amount next to Ace, the corporate defendant, and that's not surprising because there had been a jury instruction telling the jury you may not award duplicative damages. And with three defendants and two counts, the Wage Act and the contract count, it's conceivable that if they put them everywhere they'd think this is a cumulative verdict as opposed to one verdict. So I say that the jury really followed the judge's instructions and awarded against three defendants found liable the full amount of $958,830. However, to ensure there's no confusion about that, we went to sidebar and asked the judge if that could be clarified. And importantly, the defense counsel joined in that request. There's a quote from the sidebar conference. We need to ask the jury   of this $958,830. There was no objection. In fact, there was a request for that $958,830 to be awarded to the defense counsel And there was a bit of a gamble for him, but when it came back, the gamble did not pay off for the defense because the jury, wanting to show the fact that they did intend to hold the individual defendants liable, took $100,000 apiece from the original $958,830 and plugged that in next to Hennessey $100,000 and Hunton $100,000. Again, showing that all three defendants are liable for violation of the Wage Act in the total collective sum of $958,830. The First Circuit in the McIsaac case is consistent with the Supreme Judicial Court in the Solomon case in that when there are allegedly inconsistent jury answers to special questions, they should be harmonized if they can be harmonized. Here, Your Honors, they certainly can and Judge Sitter effectively did that. He recognized that the Wage Act is an act of strict liability and that the President and Treasurer of the corporate employers are personally liable for the corporation's wage debt. So here, you really have just the same jury twice finding that these three defendants are all liable for violations in the total amount of $958,830 and it's easy to harmonize that, particularly against the backdrop of the instruction not to award duplicative damages. So we would just close, Your Honors, by saying Mr. Ellicott worked for five years. He generated $37 million in revenue for the company. They never agreed to pay him any of the commission that he was entitled to. He went through a trial.  that. You mean they never paid him. Your thesis is that they did agree to pay, but they never paid. They did agree to pay and the jury said they required to pay and they did not pay. And that's why we're here. Thank you. Thank you. First off, the case cited by Judge Burroughs, cited by Mr. King, excludes the two cases I cited specifically, calling them out as Judge Burroughs did. The main point I would have to make is this. This case has to be reversed. Because we have a president and a CFO of a company who are charged with a liability $600,000 more than the company to which they are responsible for. And the reason it became out that way was because of the problem of the equitable judgment of the  The judgment       company was liable for $600,000 more than the company to which they are responsible for. The judgment of the company             for. The judgment of the company was liable for